UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| JEREMIAH ALLSOPP, | ) |
| Plaintiff, | ) |
| v. | ) 4:18-cv-56-SKL |
| MATTHEW HARE and COFFEE COUNTY, TENNESSEE, | ) |
| Defendants. | ) |

**<u>ORDER</u>**

Before the Court is Plaintiff Jeremiah Allsopp's Motion for Judgment Notwithstanding the Verdict and/or New Trial [Doc. 136]. Defendants Matthew Hare and Coffee County, Tennessee, filed a response [Doc. 142], and Plaintiff filed a reply [Doc. 145]. This matter is now ripe.

**I.    BACKGROUND**

This is a civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff sued Coffee County corrections officer Matthew Hare, claiming Hare violated his Fourteenth Amendment right not to be subjected to the use of unreasonable force when he was a pretrial detainee at the Coffee County jail. He sued Coffee County alleging it was responsible for Hare's use of force because it condoned Hare's actions. The case proceeded to trial before a jury on October 19 and 20, 2021. After deliberating for several hours, the jury returned a verdict in favor of Hare, which the parties agreed resulted in a verdict in favor of Coffee County as its liability was premised upon Hare's. The Court entered judgment in favor of Defendants on October 21, 2021 [Doc. 132]. Plaintiff then filed the instant motion on November 18, 2021.

## II. STANDARDS

### a. Rule 50

Federal Rule of Civil Procedure 50 provides:

> **(a) Judgment as a Matter of Law.**
>
> > (1) In General. If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> >
> > > (A) resolve the issue against the party; and
> > >
> > > (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
> >
> > (2) Motion. A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.
>
> **(b) Renewing the Motion After Trial; Alternative Motion for a New Trial**. If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
>
> > (1) allow judgment on the verdict, if the jury returned a verdict;
> >
> > (2) order a new trial; or
> >
> > (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50.

A court can grant a Rule 50 motion "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (*Radvansky v. City of Olmstead Falls*, 496 F.3d 609, 614 (6th Cir. 2007)). The Court must not "reweigh the evidence or assess the credibility of witnesses." *Id.* (citation omitted); *see also Mys v. Mich. Dep't of State Police*, 886 F.3d 591, 599 (6th Cir. 2018) ("[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record . . . [,] draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (alterations in *Mys*)).

b.  **Rule 59**

Federal Rule of Civil Procedure 59(a) allows a court to "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" The "decision to grant or deny a motion for a new trial 'is discretionary with the district court.'" *Koshani v. Barton*, No. 3:17-CV-265, 2020 WL 535960, at *7 (E.D. Tenn. Feb. 3, 2020) (quoting *Davis ex rel. Davis v. Jellico Cmty. Hosp. Inc.*, 912 F.2d 129, 132-33 (6th Cir. 1990)).

In the Sixth Circuit, "a new trial is improper unless a jury reached a result that is 'seriously erroneous,' 'as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some way, i.e., the proceedings being influenced by prejudice or bias.'" *Id.* (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996)). "[C]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or

3

because judges feel that other results are more reasonable." *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 821 (6th Cir. 2000) (quoting *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)). As the *Anchor* court elaborated:

> A trial court may not grant a new trial on the ground of insufficient damages unless the jury verdict is one *that could not reasonably have been reached*. *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 546 (6th Cir.1981). The remedy of a new trial for inadequate damages is appropriate only where the evidence indicates that the jury awarded damages in an amount substantially less than *unquestionably* proved by the plaintiff's *uncontradicted and undisputed* evidence.

*Anchor*, 94 F.3d at 1021 (first emphasis added; all other emphases in original).

### III.  ANALYSIS

To establish a claim for the use of excessive force, a pretrial detainee "must only show that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). In determining whether a defendant's use of force was objectively reasonable, the jury must consider all of the relevant facts and circumstances known at the time of the encounter. *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 528 (6th Cir. 2018) (Whether force used was excessive must be determined "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." (citation omitted)). The jury "must also account for the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 576 U.S. at 397 (internal quotation marks and citation omitted). Factors to consider include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by

4

> the officer to temper or to limit the amount of force; the severity of
> the security problem at issue; the threat reasonably perceived by the
> officer; and whether the plaintiff was actively resisting.

*Id.* at 396.

Plaintiff's claims against Defendant Hare arise from an encounter between the two that occurred on August 29, 2017. It began as a verbal altercation, which resulted in Defendant Hare ending Plaintiff's recreational time. While walking Plaintiff back to his cell, Defendant Hare forced Plaintiff down to the floor, handcuffed him, and then escorted him to his cell. Plaintiff claims the use of force during the encounter was excessive under the circumstances.

Plaintiff asserts he is entitled to judgment as a matter of law regarding Defendant Hare's liability under Rule 50 with a new trial on damages; or, in the alternative, a new trial on liability and damages [*see* Doc. 136 at Page ID # 1599 ("The Court should grant judgment on liability as a matter of law under Rule 50, with a retrial over damages, punitive damages, and municipal liability only. Should the Court find that there are any facts meaningfully in dispute, then the Court should separately consider the weight of the evidence under Rule 59 and grant a new trial more generally.")].

### A. The Sufficiency and Weight of the Evidence

Plaintiff contends that no reasonable juror could find that Hare's take-down was reasonable because "there was no need for any force." [*Id.* at Page ID # 1596]. Plaintiff concedes Allsopp "had been disrespectful," but he argues Allsopp "was voluntarily going to his cell as a punishment for that disrespect." [*Id.*]. As for the other *Kingsley* factors, Plaintiff contends (1) the "security problem was practically nonexistent" because it "simply" involved "verbal disrespect," (2) the "issues of injuries was generally disputed," (3) "no rational jury could have found at the time of

5

Case 4:18-cv-00056-SKL   Document 146   Filed 02/03/22   Page 5 of 17   PageID #: 1998

the use of force [that] Allsopp was disobeying," and (4) "there was no evidence that Allsopp said anything that could reasonably be construed as threatening." [*Id.* at 1596, 1597, & 1598].

Defendants submit "the sufficiency and weight of the evidence support the jury verdict that defendant Hare's use of force on Allsopp was not objectively unreasonable." [Doc. 142 at Page ID # 1970].

Defendants cite Hare's initial interaction with Plaintiff on the day of the incident in question when Allsopp demanded to be moved to a different cell through the jail's intercom system [Doc. 138 at Page ID # 1794]. Hare testified that Plaintiff made the demand in a threatening manner that was concerning to Hare from a security perspective. An officer (not Hare) told Plaintiff to "lock down" or "go up," meaning back to his cell, and Plaintiff refused [*id.* at Page ID # 1825-26]. According to Hare, after being informed that his request to change cells would not be fulfilled, Plaintiff said, "you better reevaluate your decision or there will be a problem," which Hare interpreted as meaning "there would a problem in general with the officers." [*Id.* at 1827-28]. At this point, Hare was instructed by his supervisor, Sergeant Hegwood, to get Plaintiff to go back to his cell, and so Hare walked down to the open area of the "pod," where several inmates, including Plaintiff, were walking laps or standing around. Once Hare got to the floor, Plaintiff immediately began walking towards Hare. As the two became closer, Plaintiff had his arms at about chest level, which alarmed Hare because "[j]ust an inmate being close to an officer, having his hands above his waist could result in a striking manner if he's aggravated or not getting what he wants." [*Id.* at 1800-01]. Hare testified that Plaintiff was angry and frustrated when Hare asked him to return to his cell. At some point, Plaintiff began pointing his finger at Hare, and Hare testified:

> Q. How is that aggressive, him pointing his finger?

6

> A. Well, already disobeying a command, having his shirt off, being in an aggravated mood, pointing his finger at me could be a threatening move. Trying to think of the word. Intimidating type of response for an inmate.
>
> Q. Is it – is a violation to threaten or intimidate a corrections officer if you're an inmate?
>
> A. Yes, it is.
>
> Q. Why is that a problem? Why is that a violation?
>
> A. Because if one inmate can do it, they all can, and it will just also result in violence.
>
> Q. All right. You mentioned his shirt's off. What's the significance to you of the inmate being agitated, aggressive with his shirt off?
>
> . . . .
>
> A. Inmates usually take their shirts off whenever they're about to get into a fight.

[*Id.* at Page ID # 1802-03].

Plaintiff began walking toward his cell, and he continued to ask to have his cell changed. At one point, Plaintiff lifted his hand into the air, and told Hare that if Hare "put one more effing hand on him, he'll have something coming for me," which Hare also considered threatening [*Id.* at 1807]. Hare's description of the events is corroborated by the video evidence (other than the commentary, as the video does not have any sound). Hare testified:

> A. At that point, I felt like I was in danger.
>
> Q. Why?
>
> A. Because me perceiving an inmate lifting up their hand and after he's already been given the orders and making a threat, I don't entirely know his next move. So I have to act quickly based on what

7

> I perceive to make sure that no situation comes any further of any danger or harm.
>
> Q. Now, at – at this point, . . . did you feel like you had any other options available to you such as backing up, retreating, calling in the calvary, anything like that?
>
> A. No, I did not.
>
> Q. Why not?
>
> A. Had I backed up and a situation happened in an aggressive manner, it could backfire on me if not dealt with immediately.
>
> Q. Did you believe at this point that he had the opportunity to attempt to injure – or injure you if he chose to do so?
>
> A. Yes.
>
> Q. Why did you believe that?
>
> A. Because he had not been searched. He could have reached for anything had it been on his person and used it against me.

[*Id.* at Page ID # 1810-12].

The two continued to walk, past the steel tables in the pod floor, and Hare testified that, "at this point, [Plaintiff] turns his head and shoulders and goes to move his hand up, and I quickly and tactfully [sic] respond and place him on the ground in a quick manner that is not injuring or threatening to either of us. Just quickly just subdue him." [*Id.* at Page ID # 1812]. Hare testified that he took Plaintiff down in a manner designed to allow Hare's own arm to take the "blunt of the force" that occurred as a result of the take down [*Id.* at Page ID # 1813].

Hare testified that he did not perform a take down on Hare when they were near the steel tables on the pod floor because "either I could myself or hurt him essentially." [*Id.* at 1806]. Hare further testified that he did not use force to take Plaintiff down solely because of the language and words Plaintiff used, but also because of "Body language, actions, aggression," Hare's knowledge

8

that Plaintiff had previously been caught with a pair of scissors in his laundry bag, and the fact that Plaintiff turned towards Hare and moved his hand towards Hare as Hare was escorting Plaintiff to his cell [*id.* at Page ID # 1814-15]. Hare had not searched Plaintiff prior to escorting him back to his cell [*id.* at Page ID # 1809].

Contrary to Plaintiff's argument, a reasonable jury could have credited Hare's testimony—which was generally corroborated by other proof offered at trial, including the video—and found that Plaintiff was disobeying orders, acting in a threatening and hostile manner, and physically gesturing in a way that a reasonable officer using his split second judgment could have perceived as dangerous, particularly given Hare's knowledge that Plaintiff had been caught with scissors in his laundry basket in the past, and Hare's knowledge that Plaintiff's request for a cell change had just been denied. This proof addresses a number of the *Kingsley* factors, including the need for the use of force and the amount of force used, Hare's efforts to temper the use of force, Hare's perception of the threat, and whether Plaintiff was actively resisting.

Plaintiff argues that a still photograph from the surveillance video shows that Allsopp was not reaching backward and did not raise his hand [Doc. 145 at Page ID # 1987]. But the still photograph does show Plaintiff beginning to turn and beginning to raise his hand up, consistent with Hare's testimony, and certainly a reasonable juror who had seen the surveillance video (which was played at trial) could conclude that Plaintiff was making movements consistent with Hare's testimony, particularly in light of the interaction between Plaintiff and Hare in the minutes leading up the take-down.

Plaintiff points to other factual disputes, for example what words Plaintiff used, how many times Hare or other officers told Plaintiff to return to his cell, who touched who first, and the length of time between Plaintiff's last hand gesture and defiant comments and when Hare actually took

9

him down. Most of these boil down to credibility disputes, and as addressed above, the Court finds that any ambiguity in the video or the still image Plaintiff pulled from the video is insufficient to call into question the jury's verdict. Plaintiff argues, "Hare could have let Allsopp enter the cell without touching him," but this is not the standard. The standard is whether the jury could have reasonably found that Hare's actions were reasonable.

As for the extent of his injuries, Plaintiff acknowledges that two different sets of X-rays showed no broken bones "or other visible problems." [Doc. 136 at Page ID # 1590]. He appears to concede his only evidence of injuries were his own complaints to jail and medical staff. In his argument on the instant motion, Plaintiff does not otherwise meaningfully address his injuries, instead relying on the position that "the Sixth Circuit does not require an injury for a finding of excessive force." [Doc. 136 at Page ID # 1596]. Plaintiff ignores the fact that the extent of his injuries is plainly a relevant consideration. *See Roberts v. Coffee Cnty.*, 826 F. App'x 549, 556 (6th Cir. 2020) ("In the excessive-force context, the focus is on the extent of the force used rather than the extent of the injuries, although the two are at least imperfectly correlated." (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010))). A reasonable jury could certainly have inferred from the proof presented at trial that Plaintiff's injuries were minimal, and could have disbelieved Plaintiff's subjective complaints and testimony.

The cases Plaintiff cites are distinguishable from the instant case. First, the Court notes most if not all appear to have been decided at the summary judgment stage when courts must view the evidence in the light most favorable to the nonmoving party, which in civil rights cases is generally the plaintiff. Here, by contrast, a *jury* has reviewed the evidence and determined that Plaintiff failed to establish his claim, such that the Court must make all reasonable inferences in

favor of the prevailing party under Rule 50(b), or weigh the evidence and determine whether a reasonable jury could have rendered the same verdict under Rule 59.

In *Burgess v. Fischer*, the plaintiff was "handcuffed, surrounded by four jail officials, and compliant" with the officers' orders when he was taken down. 753 F.3d 462, 474 (6th Cir. 2014). In *Morabito v. Holmes*, the Sixth Circuit held that "provoking an altercation with Morabito [the pretrial detainee] out of frustration with his repeated verbal outbursts and demands for medical treatment, ultimately slapping, tasing, and punching Morabito while he was pinned under two officers, does not constitute an objectively reasonable use of force." 628 F. App'x 353, 358 (6th Cir. 2015). In *Coley v. Lucas County,* the plaintiff pretrial detainee "was handcuffed, in a belly chain and leg irons" when he was taken down, and "nothing in facts alleged suggests a loss of disciple or order at the time the shove occurred." 799 F.3d 530, 539 (6th Cir. 2015). *Miller v. Sanilac County* involved a suspect, not a pretrial detainee, and in applying the Fourth Amendment factors, the Sixth Circuit noted the excessive force claim "admittedly comes close to the 'scintilla of evidence' . . . this Court has previously found to be insufficient to survive summary judgment." 606 F.3d 240, 253-54 (6th Cir. 2010). *Rudlaff v. Gillespie* also involved a suspect, not a pretrial detainee. 791 F.3d 638 (6th Cir. 2015). In that case, the court noted that active resistance to arrest justifies the use of a taser, but if a suspect has stopped resisting or never resisted, the use of a taser is not justified. *Id.* at 642. Plaintiff cites the case for the proposition that active resistance does not include being "compliant or hav[ing] stopped resisting." *Id.* at 641. However, as discussed above, there was proof offered at trial that Plaintiff was still showing signs of hostility and verbal defiance.

*Thomas v. Plummer* also involved a suspect, not a pretrial detainee. 489 F. App'x 116 (6th Cir. 2012). In that case, "by the time Officer Plummer deployed his taser, . . . Thomas had assumed

11

a completely submissive position by dropping to her knees and raising her hands above her head. Then, and only then, did he walk behind her and taser her in the back." *Id.* at 125. Finally, in *Smoak v. Hall*, the plaintiff was "initially compliant with the police officers' demands," and he was handcuffed when the officer "knocked his legs out from under him, and [threw] him to the pavement face-first." 460 F.3d 768, 783-84 (6th Cir. 2006).

B. **Exclusion of Evidence**

In connection with his request for a new trial, Plaintiff argues the Court "improperly excluded evidence about Hare's motive, malice, and intent in assaulting Allsopp, and also about the defective nature of Kevin Hegwood's opinion as to his character." [Doc. 136 at Page ID # 1600]. Plaintiff contends he "should have been allowed to introduce evidence regarding Hare's other incidents involving Danny Jacobs, Johnny Brooks, Robert Chrisman, and especially Clifton Pruitt." [*Id.*].

The Court addressed the reports relating to these incidents in detail in its order at Docket No. 120. The Court reiterates its holdings addressed therein—the reports are not admissible for the purpose of establishing Plaintiff's excessive force claim, because "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Kingsley*, 476 U.S. at 398. "[W]e look to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Evans v. Plummer*, 687 F. App'x 434, 440 (6th Cir. 2017).

Plaintiff's argument that Hare "relied upon his own state of mind as a defense to the claim" [Doc. 136 at Page ID # 1600] is not well-taken. In connection with this argument, Plaintiff cites the scissors incident. But the Court did not find that proof of the scissors incident was relevant to show Hare's "righteous state of mind." [*Id.* at Page ID # 1602]. The Court found the scissors

12

incident was relevant because in determining whether Hare's use of force was reasonable, the jury must consider the facts and circumstances *known* to him at the time of the encounter. *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 528 (6th Cir. 2018) (When force used was excessive must be determined "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." (quotation marks and citation omitted)). It certainly could be reasonable for Defendant Hare to be more wary of Plaintiff because he believed Plaintiff had previously possessed/concealed a dangerous weapon—it seems natural that a guard would think such an inmate could be more dangerous or difficult to subdue. *See Bronzino v. Dunn*, 558 F. App'x 613, 615 (6th Cir. 2014) ("One relevant consideration is the extent of the immediate threat posed by the defendant in light of the totality of the circumstances confronting the officer. . . . Bronzino's prior offenses were relevant to the officers' determination of how much force would be necessary to subdue Bronzino."); *Hubbard v. Gross*, 199 F. App'x. 433, 444 (6th Cir. 2006) ("*Ruvalcaba* stands for the point of law that officers can introduce evidence of previous encounters with a detainee if previous encounters would be relevant to show how much force is reasonable in a subsequent arrest." (citing *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995))).

The other evidence Plaintiff cites likewise pertains to the scene of Hare's interaction with Plaintiff. Part of the jury's duty was to decide whether a reasonable officer would have felt threatened, as Hare did, or whether a reasonable officer could have perceived that there were other options to deploy besides performing the take-down. This does not open the door to introduction of Hare's prior (allegedly) bad acts. The jury is not expected to determine reasonableness in a vacuum.

13

The Court did hold that Hare's state of mind could be relevant for the purpose of establishing whether Plaintiff is entitled to punitive damages. However, the jury found Hare did not use excessive force. Because the jury never reached the question of punitive damages, any error in excluding the reports is harmless.[1] *See Armstrong v. Shirvell*, 596 F. App'x 433, 442 (6th Cir. 2015) ("An error does not affect a party's substantial rights if one can say with fair assurance . . . that the judgment was not substantially swayed by the error." (cleaned up)). Plaintiff contends, "[w]hile it is true that the jury did not ultimately reach the issue of punitive damages, nonetheless the evidence should have been admissible." [Doc. 136 at Page ID # 1601]. He cites to no authority supporting this conclusory assertion.

Moreover, the Court found the incidents (as described in the reports) involving Jacobs and Chrisman were too factually dissimilar to the incident in question in this case to be relevant even on the issue of Hare's state of mind as it pertains to punitive damages. The Court excluded these incident reports in limine, concluding any probative value was outweighed by the risk that the jury would be distracted and confused by these incident reports involving inmates who are not parties to this lawsuit. Although the Court found the incidents with Brooks and Pruitt were more similar factually than the other incidents, the Court found the Brooks and Pruitt incident reports were also not relevant because they did not tend to show any malicious intent or any continuous course of conduct involving malice and retaliation against inmates.[2] Plaintiff does not point to any aspect

---

[1] The Court addresses Plaintiff's arguments regarding the impeachment value of the evidence below.

[2] This same reasoning applies to whether the reports were relevant to establish Plaintiff's excessive force claim, discussed above, as well. In other words, even assuming Hare's state of mind is relevant to show excessive force, as Plaintiff argues, the reports should be excluded under Rule 403 if offered for that purpose.

14

of the incident reports that would bear on Hare's character for truthfulness, despite his bald claim that Hare's "recounting of events is false." [Doc. 145 at Page ID # 1992].

Relying on the concept of curative admissibility and Federal Rule of Evidence 405, Plaintiff also contends evidence regarding the incidents was relevant to impeach Kevin Hegwood after he testified at trial that Hare was a "fine officer." Plaintiff does not clearly state what evidence he intended to offer to "impeach" Hegwood, i.e., the reports or only cross-examining Hegwood about the incidents. Regardless, the only incident even potentially relevant to impeach Hegwood involved Pruitt – when Hare was found to have used excessive force. The other three incidents do not cast doubt on Hegwood's opinion that Hare was a "fine officer." Hare was not disciplined after these incidents and in one incident he did not use force at all.

Regarding the Pruitt incident, Plaintiff contends it "had strong probative value as to Hare's character, and it had strong value as to the validity of Hegwood's opinion and judgment." [Doc. 136 at Page ID # 1602]. The incidents are not admissible to show Plaintiff acted in conformity with any particular character trait. *See* Fed. R. Evid. 404(b) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); *see also Spencer v. McDonald*, 705 F. App'x 386, 390 (6th Cir. 2017). As to its admissibility for impeachment of Hegwood's testimony, the Court further notes that Hegwood's testimony was in the nature of a supervisor discussing his employee. Hegwood was specifically asked, "And as his supervisor, do you have an opinion of Officer Hare as a corrections officer?" [Doc. 137 at Page ID # 1705]; *see also, e.g., Crabbs v. Pitts*, No. 2:16-cv-0387, 2018 WL 5262307, at *8-9 (S.D. Ohio Oct. 23, 2018) (holding that testimony about "commendations, awards, and past performance" does not open the door to questioning about "past issues"); *cf. Helfrich v. Lakeside Park Police Dep't*, 497 F. App'x 500, 509 (6th Cir.

15

2012) (holding that door was opened when counsel remarked defendant "was the star of the family," that being arrested was "completely humiliate[ing]" and "very embarrassing," and further that it was challenging "having to explain what an arrest means to my niece and nephew and, you know, see Uncle Steve going to jail. You know, that's a tough thing to explain to kids."). Plaintiff did not object, and the Court also permitted Plaintiff to ask Hegwood whether Hegwood was aware of any times when Hare was disciplined for using excessive force, and Hegwood testified he was not aware of any [Doc. 137 at Page ID # 1720-21]. Plaintiff also questioned Hare about Hare's other uses of force.

Further, there was no elaboration regarding what Hegwood meant by "fine officer," and as such there is no basis to conclude that proof about the Pruitt incident has any probative value at all for the purpose of impeaching Hegwood, let alone probative value that is not substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. Fed. R. Evid. 403; *see also United States v. Pennington*, No. 12-06-GFVT, 2012 WL 1658717, at *1 (E.D. Ky. May 11, 2012) ("The use of prior bad acts at trial is a delicate issue as there is a high danger that the introduction of such evidence may lead to an improper guilty verdict from a jury."); *United States v. Stout*, 509 F.3d 796, 801 (6th Cir. 2007) ("There is a high probability that the jury would improperly consider the prior bad acts evidence as propensity evidence . . . .").

Whether Hare's supervisor considers him a "fine officer," is not relevant to determining if Hare used excessive force on the date in question because, as discussed above, the standard is objective. To the extent Plaintiff is arguing that being considered a "fine officer" tends to suggest Hare is less likely to lie on the stand about the interactions with Plaintiff (which the Court does not find), nothing about the Pruitt incident bears on Hare's truthfulness, and there is no reason to

16

think Hegwood would have disavowed the "fine officer" label had Plaintiff been permitted to specifically ask about the Pruitt incident.

Accordingly, the Court concludes it did not err in excluding the incident report and/or testimony about the Pruitt incident. Even if the exclusion was error, the Court further finds the testimony/proof did not affect any substantial rights of Plaintiff or render Plaintiff's trial unfair, making any such alleged error harmless.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's Moton for Judgment Notwithstanding the Verdict and/or New Trial [Doc. 136] is **DENIED**.

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE